In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2759

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STEFAN DIMITROV,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 388-1—**Milton I. Shadur**, *Judge.*

ARGUED FEBRUARY 12, 2008—DECIDED OCTOBER 3, 2008

Before EASTERBROOK, *Chief Judge*, and RIPPLE and
ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge.* Stefan Dimitrov entered a condi-
tional guilty plea to one count of operating an unlicensed
money transmitting business in violation of 18 U.S.C.
§ 1960(a). He was sentenced to three months' imprison-
ment to be followed by three years of supervised release.
Dimitrov now appeals, challenging the constitutionality
of § 1960 and the district court's ruling on a motion in
limine decided before his guilty plea. For the reasons
explained herein, we affirm.

I.

In 1998 Dimitrov, a Bulgarian immigrant, began operating an institution known as the Bulgarian Cultural Center on Irving Park road in Chicago. Dimitrov and his wife at the time, Tatiana Dimitrova,[1] offered a number of services to the Bulgarian community through the Cultural Center, including document translation and assistance with everything from green card applications to locating employment. The Cultural Center also contained a library of Bulgarian books and videos, jewelry from Bulgaria for sale, and a small kitchen. According to Dimitrov, people began asking for assistance transferring money to Bulgaria. Initially he assisted others by translating the money transmitting forms into English and using his personal checking account to transfer the funds. As the number of requests for help transferring money increased, he opened a separate account at TCF Bank to transmit money to Bulgaria.

The money transmitting service supplied the bulk of any income that Stefan and Tatiana made running the Cultural Center. The Dimitrovs charged a flat $20 fee for the service in addition to a small (usually .5%) percentage of the total amount transferred. The Department of Immigration and Customs Enforcement began investigating the Dimitrovs' business after reviewing bank records from TCF Bank suggesting that the Dimitrovs may not have a required license to operate a money transmitting business. The

---

[1] Stefan and Tatiana divorced before Dimitrov entered his guilty plea, and he has since remarried.

bank records revealed deposits into an account named "B Connection," which Dimitrov used to wire money to the Bulgarian Post Bank in Sofia, Bulgaria. Investigating agents then used the bank records to identify Bulgarians who had used Dimitrov's money transmitting business. One of these individuals agreed to cooperate with the agents and explained that he had wired money to Bulgaria using B Connection on multiple occasions. He would give one of the Dimitrovs the cash for wiring, the name of the intended recipient of the money, and the Bulgarian equivalent of the Social Security number of the recipient. The cooperating individual recounted that his family members later retrieved the money from the Bulgarian Post National Bank. In later transactions, Dimitrov made the process more secure by having customers deposit their funds for transfer directly into the account at TCF Bank. Between January 2003 and April 2005 the Dimitrovs transmitted approximately $3,000,000 to Bulgaria on behalf of their customers.

Although the Dimitrovs' money transmitting business was by all accounts a legitimate one, it lacked the license required by Illinois for money transmitting. 205 ILCS 657/10. That oversight amounted to a felony by virtue of 18 U.S.C. § 1960(a), which prohibits operating an "unlicensed money transmitting business." Such a business is defined by reference to state law, making it a violation of § 1960(a) to operate without an appropriate money transmitting license where the failure to have a license is punishable "as a misdemeanor or felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so

punishable." § 1960(b)(1)(A). Under Illinois law, the failure to obtain the required money transmitting license is a Class 3 felony. 205 ILCS 657/90(h).

Instead of the required money transmitting license, Dimitrov obtained a Limited Business License from the City of Chicago "for general sales, service and office operations/or businesses that do not fall under another license category and are not exempt from City licenses," *see* Chicago, Ill., Mun. Code § 4-4-020, which he believed discharged his licensing obligations. That belief, if genuine, became less tenable in September 2004, when TCF Bank sent him the first of several letters requesting verification of the registration and licensing status of his money transmitting business. The letter included a form entitled "Verification of Licensing and Registration for Money Service Business" which Dimitrov was instructed to complete and sign. When it received no response from Dimitrov, TCF Bank sent him a second letter in November 2004 requesting that he verify his licensing status and warning him that failure to do so would result in closure of his account. In December, TCF Bank sent Dimitrov a third letter informing him that it had reviewed his account and determined that he was operating a business that provided money services. That letter requested a current copy of B Connection's state license and its anti-money laundering policy and procedures as well as the IRS acknowledgment that B Connection was registered with the Financial Crimes Enforcement Network. The letter warned that failure to respond with the requested verifications within 30 days would result in closure of his accounts.

Presumably prompted by the letters from TCF Bank, Dimitrov looked into obtaining a money transmitting license in late 2004 or early 2005. Dimtrov and a business associate, Hamid Rusef, traveled to Springfield and met with Phil Sanson, a senior examiner for Illinois in the Department of Financial and Professional Regulation. Sanson explained to Dimitrov and Rusef the process for obtaining a money transmitting license and also gave them the application packet, which contains a checklist of the required materials. Dimitrov, however, never completed the application materials. When Dimitrov failed to respond to its warnings, TCF Bank ultimately closed the accounts associated with his money transmitting business. He then transferred the accounts to Bank One, where he continued transmitting money through April 2005.

Dimitrov and his wife Tatiana were charged in July 2005 with one count of violating § 1960(a). Tatiana pleaded guilty pursuant to a written plea agreement, but Dimitrov initially intended to proceed to trial. On the day Dimitrov's trial was scheduled to begin, he elected to enter a conditional guilty plea. Dimitrov's decision came as a result of the district court's ruling on the government's motion in limine to prevent Dimitrov from presenting evidence that he lacked knowledge of the Illinois licensing law. Dimitrov planned to testify at trial about his Limited Business License and his belief that the license relieved his duty to obtain the required money transmitting license. Before trial, the district court concluded that Dimitrov's belief that the Limited Business License was sufficient

would be irrelevant, because § 1960(a) does not require knowledge of state licensing requirements. Faced with this ruling, Dimitrov chose to plead guilty, but reserved his right to challenge the constitutionality of § 1960(a) to the extent that it does not require the defendant to know that his conduct is illegal.

## II.

On appeal, Dimitrov argues that § 1960(a) is unconstitutionally vague. Specifically, Dimitrov claims that the statute lacks a *mens rea* element and so fails to give fair notice of prohibited conduct. To understand Dimitrov's argument, a brief history of § 1960 is in order.

### A.  18 U.S.C. § 1960(a)

Congress enacted § 1960(a) in 1992 in response to concerns that nonbank financial institutions (money transmitters, check cashers, and foreign exchange dealers) were increasingly being used to transfer the proceeds of illegal activity. *See* S. Rep. No. 101-460 (September 12, 1990); *United States v. Velastegui*, 199 F.3d 590, 593 (2d Cir. 1999). The original version of § 1960 provided in pertinent part as follows:

> (a) Whoever conducts, controls, manages, supervises, directs, or owns all or part of a business, *knowing the business is an illegal money transmitting business*, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

(b) As used in this section—

(1) the term "illegal money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and—

(A) is *intentionally operated without an appropriate money transmitting license* in a State where such operation is punishable as a misdemeanor or felony under State law; or

(B) fails to comply with the money transmitting business registration requirements under [31 U.S.C. § 5330], or regulations prescribed under such section . . . .

18 U.S.C. § 1960 (1992) (amended 2001) (emphasis supplied).

As part of the Patriot Act, Congress amended § 1960 on October 26, 2001, in an attempt to make it easier to prosecute those responsible for funneling money to terrorism. *See Report from the Field: The USA PATRIOT Act at Work*, at 10, http://www.usdoj.gov/olp/pdf/patriot_report_from_the_field0704.pdf. The amended version reads in pertinent part as follows:

(a) Whoever *knowingly* conducts, controls, manages, supervises, directs, or owns all or part of *an unlicensed money transmitting business*, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

(b) As used in this section—

(1) the term "*unlicensed* money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and—

(A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, *whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable*;

18 U.S.C. § 1960 (as amended October 26, 2001) (emphasis added).

The 2001 amendments thus removed the scienter requirement of the former version, making § 1960 a "general intent crime for which a defendant is liable if he knowingly operates a money transmitting business." H.R. Rep. No. 107-205, pt. I, at 54 (2001). Under the amended § 1960, the government no longer need prove that a defendant was aware of state licensing requirements or that he knew about the federal registration requirements found at 31 U.S.C. § 5330 (requiring owners or controllers of money transmitting businesses to register with the Secretary of the Treasury). *See id.*; *see also United States v. Elfgeeh*, 515 F.3d 100, 132 (2d Cir. 2008) (recognizing that the amendment "made § 1960(a) stricter by eliminating the requirement of proof that the defendant knew that a license was required").

B.  Dimitrov's Vagueness Challenge to § 1960(a)

According to Dimitrov, § 1960 "does not contain a *mens rea* element," and therefore fails to give fair notice of prohibited conduct. Dimitrov also maintains that because § 1960 is broader than necessary "to satisfy the legislature's intent," it invites arbitrary enforcement. A criminal statute is unconstitutionally vague if it fails to sufficiently define prohibited conduct so that ordinary individuals understand what is prohibited or fails to establish minimal guidelines to prevent arbitrary or discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983); *United States v. Watzman*, 486 F.3d 1004, 1009 (7th Cir. 2007).

In *United States v. Talebnejad*, 460 F.3d 563, 568 (4th Cir. 2006), the Fourth Circuit considered and rejected a vagueness challenge to the amended version of § 1960. In considering the defendant's contention that § 1960 was unconstitutional by virtue of its failure to recognize ignorance of state licensing requirements as a defense to liability, the Fourth Circuit noted that, "[t]here is no question that, at least under some circumstances, Congress may dispense with a *mens rea* element, as it has clearly done with respect to § 1960(b)(1)(A)." *Talebnejad*, 460 F.3d at 568 (internal citation omitted). By failing to acknowledge this, Dimitrov conflates legal knowledge with factual knowledge. True, the statute no longer contains any requirement that a money transmitting operator know that what he is doing is prohibited by state law. But "[t]he rule that 'ignorance of the law will not excuse' is deep in our law." *Lambert v. State of California*, 355 U.S. 225,

228 (1958) (internal citation omitted); *see also Cheek v. United States*, 498 U.S. 192, 199 (1991) ("[I]gnorance of the law or a mistake of law is no defense to criminal prosecution."). *Lambert* itself is the only Supreme Court case to recognize a "mistake of law" defense. The registration statute invalidated in *Lambert* criminalized the act of being present in Los Angeles as a convicted felon without registering, regardless of one's knowledge of the registration requirement.

Unlike the statute at issue in *Lambert*, § 1960(a) requires the affirmative action of knowingly operating a money transmitting business. *See Talebnejad*, 460 F.3d at 570 (contrasting passive presence regulated in *Lambert* with the "unquestionably active conduct of operating a business"). This is in contrast to the registration statute in *Lambert*, where the Court noted that "[v]iolation of its provisions is unaccompanied by any activity whatsoever, mere presence in the city being the test." *Lambert*, 355 U.S. at 229. Moreover, the *Lambert* Court emphasized that there were no surrounding circumstances "which might move one to inquire as to the necessity of registration." *Id.* Here, however, Dimitrov operated his business in a highly regulated industry, and could reasonably have been expected to know that there may be licensing requirements. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) ("In the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed."). The fact that § 1960 does not include knowledge of the licensing requirement as an element of the crime does not by itself render it unconstitutionally vague. It is enough

that the statute requires a defendant to know the facts that make his conduct illegal—i.e., that he is operating an unlicensed money transmitting business. *Accord, Talebnejad*, 460 F.3d at 570.

Nor are we convinced by Dimitrov's argument that ordinary individuals will not be able to differentiate between an "appropriate" money transmitting license and an inadequate one. Unlike the vagrancy ordinance invalidated in *Papachristou*, 405 U.S. at 157-171, on which Dimitrov relies, § 1960 provides objective criteria for determining what is an "appropriate" license. The reference to "State law" in § 1960(b) makes it plain that an appropriate license is whatever is required under state law. Moreover, *Papachristou* explicitly distinguished "the average householder" subject to the vagrancy ordinance at issue from an individual in "business," who would presumably be alerted to the regulatory schemes governing his conduct. *See Papachristou*, 405 U.S. at 162-63. We thus conclude that by referencing state law, the phrase "appropriate money transmitting license" provides individuals of "ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Given the language of the statute, a reasonable person would understand that a generic city business license would not pass muster as a "money transmitting license."

The objective criteria also satisfy us that the ordinance is not so broad that it invites arbitrary or discriminatory enforcement. Unlike the vagrancy and loitering statutes the Supreme Court has struck down as unconstitutionally vague, § 1960 objectively defines the illegal conduct:

operating a money transmitting business without the license required by state law. § 1960(b)(1)(A). It thus does not suffer from the chief infirmity of the unconstitutional statutes in those cases on which Dimitrov relies, which vest enforcement officials with wide discretion and contain no objective standards to prevent arbitrary enforcement. *See City of Chicago v. Morales*, 527 U.S. 41 (1999) (striking down anti-loitering ordinance that conferred "vast discretion" on police to arrest individuals remaining "'in any one place with no apparent purpose'"); *Papachristou*, 405 U.S. at 168 (noting "unfettered discretion" vagrancy ordinance placed in hands of police). We thus reject Dimitrov's suggestion that § 1960(a) creates a "trap" for unwary individuals engaging in innocent behavior. The statute explains what is required of an individual operating a money transmitting business with sufficient clarity that an ordinary person can understand that operating without a required state licence is prohibited.

C.  The Government's Motion in Limine

In a related vein, Dimitrov challenges the district court's refusal to allow him to present evidence that he was unaware of the Illinois money transmitting license requirements. Before trial, the government moved in limine to prevent Dimitrov from testifying that he believed his Limited Business License sufficed. The district court granted the government's motion after reviewing the Fourth Circuit's decision in *Talebnejad* and concluding that Dimitrov's intended defense would be unavailing. We review the district court's evidentiary decision for

abuse of discretion. *See United States v. Watts*, 535 F.3d 650, 657 (7th Cir. 2008). As discussed above, Congress explicitly removed the defense Dimitrov planned to present when it amended § 1960. Because a defendant's lack of knowledge of the state licensing requirement is not a defense to prosecution, the district court appropriately concluded that Dimitrov's proposed evidence would be irrelevant. It was therefore not an abuse of the court's discretion to grant the government's motion in limine. *See United States v. Krankel*, 164 F.3d 1046, 1054 (7th Cir. 1998) (trial court did not abuse its discretion excluding evidence that did "not tend to prove or disprove an element of the crime charged").

## D.  Unconstitutional Delegation of Legislative Authority

Finally, Dimitrov attacks the constitutionality of § 1960 on the grounds that it amounts to an unconstitutional delegation of legislative power. He claims that by relying on state law to dictate whether the operation of a money transmitting business without a license is criminal, § 1960(a) unconstitutionally delegates legislative power to the states. *See*, *e.g.*, *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529-30 (1935). Dimitrov maintains that because the operation of a money transmitting business is only a federal crime if the state legislature has made it a felony or misdemeanor, § 1960(a) transfers to the states its legislative function.

There are several problems with Dimitrov's argument, but the most pertinent one here is that he failed to preserve it when he pleaded guilty. Following the district court's

grant of the government's motion in limine, Dimitrov abandoned his plan to proceed to trial. To facilitate his plea, the government drew up an "agreed statement of facts." In it Dimitrov admits that he operated a money transmitting business without the license required by Illinois law. It also states that Dimitrov possessed a Limited Business License to do business in the City of Chicago, and that he believed the license satisfied any licensing obligations required of him. In agreeing to plead guilty, Dimitrov reserved "the right to object to the constitutionality and construction of Title 18 U.S.C. § 1960 as it relates to the mental state required to be in violation of the law."

   Nowhere does the agreed statement of facts identify the unconstitutional delegation argument Dimitrov now raises. Rule 11(a)(2), which allows conditional guilty pleas, is a narrow exception to the ordinary rule that a defendant who pleads guilty cannot appeal from his conviction or challenge the sufficiency of the indictment on appeal. *United States v. Doherty*, 17 F.3d 1056, 1058 (7th Cir. 1994). A conditional plea must be in writing and "precisely identify which pretrial issues the defendant wishes to preserve for review." *United States v. Markling*, 7 F.3d 1309, 1313 (7th Cir. 1993). Dimitrov's "conditional plea" as memorialized in the agreed statement of facts identifies and preserves only his objection to the constitutionality of the "mental state" required to sustain a violation of § 1960(a). Because Dimitrov neither objected to § 1960 as an unconstitutional delegation of legislative power before entering his plea nor specified that ground in his conditional plea, he cannot raise it now on appeal. *See Doherty*,

17 F.3d at 1058-59 ("Doherty's 'conditional' plea thus necessarily reserved the right to appeal only the denial of his motion to dismiss the indictment on the ground the motion had stated.").

### III.

For the foregoing reasons, we AFFIRM Dimitrov's conviction and sentence.