FILED
United States Court of Appeals
Tenth Circuit

September 29, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

KEVIN POWERS,

      Defendant - Appellant.

Nos. 11-2190 & 11-2241
(D.C. No. 1:09-CR-03065-MCA-1)
(D.N.M.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HOLMES**, **HOLLOWAY**,[**] and **MURPHY**, Circuit Judges.

---

Defendant-Appellant Kevin Powers was convicted of seventeen counts of

wire fraud for his role in fraudulently obtaining mortgage loans for nine houses

---

[*]      This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

[**]      The late Honorable William J. Holloway, Jr., United States Senior Circuit Judge, participated as a panel member when oral argument was heard on this case but passed away before having an opportunity to vote on or otherwise participate in the consideration of this order and judgment.  "The practice of this court permits the remaining two panel judges if in agreement to act as a quorum in resolving the appeal." *United States v. Wiles*, 106 F.3d 1516, 1516 n.* (10th Cir. 1997); *see also* 28 U.S.C. § 46(d) (noting circuit court may adopt procedure permitting disposition of an appeal where remaining quorum of panel agrees on the disposition).  The remaining panel members have acted as a quorum with respect to this order and judgment.

and making undisclosed cash payments to the buyers of those homes. *See* 18 U.S.C. § 1343. On appeal, Mr. Powers challenges his conviction based on the district court's admission of certain testimony and evidence at trial. He also challenges his sentence based on the district court's application of the gross-receipts enhancement under § 2B1.1(b)(14)(A) of the U.S. Sentencing Guidelines ("U.S.S.G" or "the Guidelines").[1] Exercising jurisdiction under 28 U.S.C. § 1291, we affirm Mr. Powers's conviction but remand to the district court for re-sentencing in accordance with this order and judgment's clarification of the proper scope of the sentencing enhancement.

## I

Mr. Powers was a realtor and mortgage broker in Albuquerque, New Mexico. In 2010, he was charged in a seventeen-count indictment in the United States District Court for the District of New Mexico. These charges arose from Mr. Powers's role in fraudulently obtaining mortgage loans for nine houses acquired by six buyers in 2006 and 2007. By providing false and incomplete information to lenders, Mr. Powers was able to obtain loans for the buyers greater than the actual sale prices of the houses. Mr. Powers funneled these excess funds

---

[1] Although the 2013 edition of the Guidelines renumbered this provision as § 2B1.1(b)(16)(A), the U.S. Probation Office used the 2010 edition of the Guidelines in preparing the Presentence Investigation Report ("PSR") in this case. Because neither party disputes that decision, we also rely on the 2010 edition.

back to the buyers in what is commonly described as a mortgage "cash back" scheme.

Mr. Powers was the central figure in this scheme. With one exception, he was the individual who located the properties involved, and he was the one that brought them to the attention of the buyers. Mr. Powers, acting for the buyers, would make offers on the properties that were considerably higher than the sellers' asking prices. He would explain the high offers to the sellers by saying that the added money was for renovations or landscaping, and that it would be paid out at closing to a firm called K&E Construction. This, however, was not the whole story. Mr. Powers did not inform the sellers that he owned K&E Construction, or that the firm was in fact merely a shell entity through which the additional money would pass before ultimately being kicked back to the buyers.

After a seller agreed to the proposed inflated purchase price, Mr. Powers would assist the buyer in applying for financing. He, rather than the buyers, prepared the loan applications; in doing so, he knowingly misrepresented both his clients' intended use of the properties and their financial qualifications for the loans. For example, he indicated that properties were being purchased as primary residences instead of as investment properties and he listed incomes far higher than the buyers' true incomes.

In the deals underlying his prosecution, Mr. Powers helped secure loans from four different lenders: SunTrust Mortgage Company, National City

Mortgage, Accredited Home Lenders, and RFC Cameron Financial Group, Inc. (collectively, the "lenders"). At the time the loans were obtained, each of the lenders offered one-hundred-percent loan-to-value stated-income financing[2] for homes bought as primary residences.

At trial, the government offered testimony from witnesses who worked at the four lenders and were familiar with their firms' lending practices in 2006 and 2007. Over multiple objections, they explained the requirements for the lenders' loan programs at issue and, based on their review of the actual loan documents in this case, they testified that the incomes listed in the loan documents qualified the buyers for the loans that they had received. The witnesses also answered hypothetical questions regarding whether these loans would have been approved if certain information on the applications had been different—that is, if the incomes had been substantially lower than stated, if the buyers had expressed an intent to use the houses as investment properties rather than primary residences, and if the lending companies had known that the money paid out at closing was actually going to the buyers to make the mortgage payments.

---

[2] A "stated-income" or "no-income-verification" loan is so called because "the lender accepts the borrower's statement of his income without trying to verify it." *United States v. Phillips*, 731 F.3d 649, 651 (7th Cir. 2013) (en banc). For this reason, these loans are sometimes referred to as "liars' loans." *Id.* One-hundred-percent loan-to-value financing simply refers to financing that covers the full purchase price of a piece of property, rather than requiring a down payment on some portion of the price.

After a nine-day trial, a jury found Mr. Powers guilty of all seventeen counts. The Probation Office prepared a PSR, in which it recommended, *inter alia*, a two-level enhancement under § 2B1.1(b)(14)(A) of the Guidelines. Section 2B1.1(b)(14)(A) provides that a two-level enhancement to a defendant's offense level is warranted where "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." In stating that the enhancement was applicable to Mr. Powers, the PSR relied on the full mortgage amounts of five of the loans, implicitly applying the entire loan amounts to Mr. Powers. Over Mr. Powers's objections, the district court applied the sentencing enhancement after finding that "as a technical matter, Mr. Powers did directly and through his shell, K&E Construction Company, derive more than 1 million dollars." R., Vol. III, at 3104 (Sentencing Hr'g, dated Sept. 13, 2011).

The district court ultimately sentenced Mr. Powers to fifty-six months' imprisonment and $1,155,317.50 in restitution.[3]

Mr. Powers now asserts three errors on appeal. First, he claims that some of the lender witnesses' testimony was admitted in error because it constituted expert testimony from lay witnesses. Second, he argues that the district court improperly allowed documents into evidence as business records without an adequate foundation. And, third, Mr. Powers contends that the district court

---

[3] Although he originally filed a notice of appeal regarding the restitution, Mr. Powers does not challenge the restitution order on appeal.

5

incorrectly applied the gross-receipts enhancement.

As to Mr. Powers's first two claims, which implicate the propriety of his conviction, upon concluding that he failed to preserve these claims, we review them for plain error and determine that the district court committed no clear or obvious error. Accordingly, we uphold Mr. Powers's conviction. On the sentencing question, by contrast, we find it necessary to clarify the correct scope of the gross-receipts enhancement. Having done so, we remand this case to the district court for re-sentencing in accordance with this order and judgment.

## II

We begin with Mr. Powers's assertion that the district court erred under Federal Rule of Evidence 701[4] by improperly allowing the lender witnesses to give expert opinion testimony and to testify to legal conclusions. Before addressing the merits of this claim, however, we first consider whether or not Mr. Powers preserved this issue. The government argues that, although Mr. Powers undoubtedly objected at trial to much of the testimony that is the focus of this appeal, he did not do so expressly on the basis of Rule 701. Instead, the government asserts that Mr. Powers merely raised a variety of objections on other

---

[4] Rule 701 limits opinion testimony from witnesses who are not qualified as experts. Such testimony must be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

6

specific grounds: speculation, lack of personal knowledge, assuming facts not in evidence, improper hypothetical, and lack of foundation.  Mr. Powers disagrees. He claims that he satisfied the preservation requirement in Federal Rule of Evidence 103 because it was "apparent from the context" of his objections that he was objecting to improper lay-witness testimony under Rule 701.  Aplt. Reply Br. at 1 (quoting Fed. R. Evid. 103(a)(1)(B)) (internal quotation marks omitted). Resolving this dispute is our first order of business.

### A

"A timely objection, accompanied by a statement of the specific ground of the objection, must be made when evidence is offered at trial to preserve the question for appeal, unless the ground is apparent from the context of the objection." *United States v. Norman T.*, 129 F.3d 1099, 1106 (10th Cir. 1997) (citing Fed. R. Evid. 103(a)(1)).  "Absent a timely and specific objection, this court reviews such challenges for plain error." *United States v. McGlothin*, 705 F.3d 1254, 1260 (10th Cir.), *cert. denied*, --- U.S. ----, 133 S. Ct. 2406 (2013); *see United States v. Ramirez*, 348 F.3d 1175, 1181 (10th Cir. 2003).

Although Mr. Powers made numerous timely and specific objections at trial, the Rule 701 issue that he presses on appeal was not the basis for any of them.[5]  It is well established in this circuit that "[t]he specific ground for reversal

---

[5]     Mr. Powers made one objection that could conceivably be read as
(continued...)

7

of an evidentiary ruling on appeal must . . . be the same as that raised at trial."

*Ramirez*, 348 F.3d at 1181 (omission in original) (quoting *Norman T.*, 129 F.3d at

1106) (internal quotation marks omitted); *accord United States v. Taylor*, 604

F.3d 1011, 1015 (7th Cir. 2010). Mr. Powers argues that, even without express

invocation of Rule 701, the nature of his concerns was clear in context because

his objections went to the "heart" of the rule's foundational requirements. The

record, however, does not bear this assertion out.

Mr. Powers's objections—scattered across approximately 600 pages of trial

testimony—specifically raised a variety of concerns *other than* Rule 701. These

objections never called "the nature of the [alleged Rule 701] error . . . to the

attention of the [district court], so as to alert [it] to the proper course of action

and enable opposing counsel to take proper corrective measures." Fed. R. Evid.

---

[5](...continued)
implicating Rule 701. It came after one of the lender witnesses, a Mr. Rowland,
stated that interest rates are generally lower for individuals borrowing money to
purchase primary residences than for those purchasing investment properties
"because . . . there is less risk for the mortgage company." R., Vol. III, at 683
(Trial Tr., dated Apr. 7–20, 2011). Mr. Powers's attorney objected, stating: "I
don't know on what basis Mr. Rowland is stating these conclusions about less risk
and more risk. There seems to be a *scientific basis* or something to do that, and I
don't know if he has that basis." *Id.* (emphasis added). We are not convinced
that one objection referring *obliquely* to the expert-opinion rules, buried in over
600 pages of trial testimony, can bear the weight of preserving a Rule 701
objection for the broad swath of testimony challenged here. Even if this objection
sufficiently stated a Rule 701 ground for Mr. Powers's objection to the Rowland
testimony, any error in overruling the objection was harmless "given the wealth
of evidence put forth by the prosecution." *United States v. Cass*, 127 F.3d 1218,
1225 (10th Cir. 1997).

103 advisory committee's note. As such, Mr. Powers's specific objections were not enough to preserve the alleged errors that he presses on appeal.[6] We thus proceed with our analysis of Mr. Powers's Rule 701 objections to the lender witnesses' testimony under the plain-error standard.[7]

---

[6] Mr. Powers directs us to several cases from our sister circuits, which he claims found a Rule 701 issue adequately preserved by objections similar to those in this case. His reliance on those cases is misplaced. Some of them fail to help Mr. Powers because the decisions do not describe the character of the objections that the courts relied on in finding the Rule 701 issue preserved. *See United States v. Johnson*, 617 F.3d 286, 292 n.6 (4th Cir. 2010) (finding that Rule 701 objection was clear in the context of the "many" other objections during the challenged testimony, but silent as to what these other objections were); *United States v. Freeman*, 498 F.3d 893, 904 (9th Cir. 2007) (same). Without that crucial information, these cases merely stand for the proposition that context *sometimes* is enough; they do not speak to whether the context should be deemed sufficient here. Other cases Mr. Powers cites do not actually address the preservation issue. *See United States v. Graham*, 643 F.3d 885, 896 (11th Cir. 2011) (declining to reach the preservation question because "[r]egardless of the applicable standard of review, the record clearly show[ed] that [the witness] was testifying based on his own personal knowledge . . . , and the district court did not err by admitting his testimony"); *Bank of China v. NMB LLC*, 359 F.3d 171, 180–81 & n.10 (2d Cir. 2004) (noting that "the District Court . . . concluded that the testimony satisfied the requirements for lay opinion testimony"). The other cases Mr. Powers points to are distinguishable because the objections more directly suggested a Rule 701 objection. *See, e.g.*, *United States v. Massino*, 546 F.3d 123, 129 (2d Cir. 2008) (objecting that testimony was "the opinion of this witness"); *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 225 (3d Cir. 2008) (objecting that witness was "[n]ot an expert witness" (alteration in original)).

[7] To the extent that Mr. Powers raises an additional challenge based on his contention that the lay witnesses were allowed to testify to "impermissible legal conclusions about materiality," Aplt. Opening Br. at 32, we find that this challenge, too, was not preserved, because Mr. Powers made no such objection at trial. Indeed, the record shows not only that Mr. Powers failed to raise a sufficiently specific objection to the materiality line of questioning, but also that Mr. Powers actually engaged in precisely the same sort of questioning he now
(continued...)

9

**B**

To succeed under our "rigorous plain-error standard," Mr. Powers must demonstrate: "(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights. If he satisfies these criteria, this Court may exercise discretion to correct the error if [4] it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cooper*, 654 F.3d 1104, 1117 (10th Cir. 2011) (alteration in original) (quoting *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007)) (internal quotation marks omitted).

As for the second prong, we have clarified that "to be clear or obvious, the error must be contrary to well-settled law." *United States v. Taylor*, 514 F.3d 1092, 1100 (10th Cir. 2008). "In general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." *United States v. Ruiz-Gea*, 340 F.3d 1181, 1187 (10th Cir. 2003). And, although the "absence of such precedent will not . . . prevent a finding of plain error if the

---

[7](...continued)

argues was inappropriate. Accordingly, we find that Mr. Powers's argument that the district court erred by admitting testimony concerning the "materiality" to the underwriting process of the various types of information included on the loan application forms is waived under the invited-error doctrine, which "precludes a party from arguing that the district court erred in adopting a proposition that the party had urged the district court to adopt." *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 771 (10th Cir. 2011) (quoting *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1204 (10th Cir. 2009)) (internal quotation marks omitted).

district court's interpretation [of statutory or regulatory provisions] was 'clearly erroneous,'" *id.* (quoting *United States v. Brown*, 316 F.3d 1151, 1158 (10th Cir. 2003)), "[g]enerally, such a circumstance [i.e., the absence of controlling precedent] will close the door on a claim that the error . . . is clear or obvious," *United States v. Schneider*, 704 F.3d 1287, 1304 (10th Cir.) (Holmes, J., concurring, joined by Martinez, J.), *cert. denied*, --- U.S. ----, 133 S. Ct. 2868 (2013). This is especially true where caselaw from our sister circuits does not definitively support a finding of error. *See Schneider*, 704 F.3d at 1304 (Holmes, J., concurring, joined by Martinez, J.); *cf. United States v. Hardwell*, 80 F.3d 1471, 1484 (10th Cir. 1996) ("Although neither the Supreme Court nor this court has decided the issue, given the weight of authority from other circuits, we conclude that the error was sufficiently clear and obvious to be plain error . . . ."); *cf. also United States v. Ahidley*, 486 F.3d 1184, 1193 n.7 (10th Cir. 2007) ("[W]e do not believe the presence of contrary circuit authority should control our determination of whether the district court's error was plain.").

In this case, even assuming *arguendo* that there was error, it would not be clear or obvious; accordingly, we need not determine under the first prong of the plain-error standard whether the district court actually erred. *See Abernathy v. Wandes*, 713 F.3d 538, 553 (10th Cir. 2013) ("We need not decide whether there was error . . . because even assuming *arguendo* that there was error, it would not be plain (i.e., clear or obvious)."), *cert. denied*, --- U.S. ----, 134 S. Ct. 1874

11

(2014). Mr. Powers's argument is that the lender witnesses' testimony failed to satisfy any of the requirements of Rule 701, which says that lay-witness opinion testimony must be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. For the reasons explained below, the lender witnesses' testimony at issue in this case did not clearly or obviously run afoul of any of these three requirements.

**1**

Rule 701(a) requires lay-witness opinion testimony to be based on the witness's "first-hand knowledge or observation." Fed. R. Evid. 701 advisory committee's note. This "perception requirement stems from [Rule] 602 which requires a lay witness to have first-hand knowledge of the events he is testifying about so as to present only the most accurate information to the finder of fact." *United States v. Bush*, 405 F.3d 909, 916 (10th Cir. 2005) (quoting *United States v. Hoffner*, 777 F.2d 1423, 1425 (10th Cir. 1985)) (internal quotation marks omitted); *see* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Mr. Powers asserts two different errors with respect to this requirement. First, he argues that the lender witnesses were not personally involved in the loans at issue in this case and thus had no first-hand knowledge of

12

why these particular loans were approved. Second, he argues that because the lender witnesses lacked personal involvement in the transactions, it was inappropriate for the district court to allow these witnesses to answer hypothetical questions relating to the transactions.

However, although the witnesses were not directly involved in the transactions, and thus lacked contemporaneous personal knowledge of them, they *did* have personal knowledge of their respective employers' lending practices at the time the transactions took place and, by the time of trial, had become familiar with the specific loan documents as well. The question is thus whether it was clear or obvious error for the district court to treat this kind of personal knowledge—contemporaneous knowledge of the policies and practices of a business combined with after-acquired knowledge of particular transactions—as sufficient under Rule 701(a), and whether it was clear or obvious error to allow such testimony when it included witnesses' opinions on the implications of various hypothetical changes to specific transactions.

That we have been unable to find any Supreme Court or Tenth Circuit caselaw that is directly on point (and Mr. Powers directs us to none) itself suggests that any error committed by the district court was not clear or obvious. *See Ruiz-Gea*, 340 F.3d at 1187. Cases from our sister circuits, while instructive to a degree, do not substantially clarify the picture—certainly not in a such a way that the district court's decision to allow the lender witnesses' testimony

13

constituted clear or obvious error. In *United States v. Hill*, 643 F.3d 807 (11th Cir. 2011), for example, which involved a very similar scheme to the case on appeal, the defendant argued that the district court had improperly allowed expert testimony masquerading as lay testimony. *Id.* at 840. As in Mr. Powers's case,

> [a]t trial, the district court permitted several representatives of victim lending institutions, all of whom were involved in mortgage and loan approval for their respective companies, to testify about whether the disclosure of misrepresentations in some of the fraudulent loan applications would have had any effect on their decision to approve the mortgage or loan.

*Id.* The Eleventh Circuit concluded that the district court "did not abuse its discretion by permitting the witnesses who had personally dealt with the fraudulent loan transactions at issue to respond to the government's questions about what would have happened if the facts had been different," *id.* at 842, indicating that in the Eleventh Circuit's view, there was nothing inherently inappropriate about lay witnesses answering hypothetical questions regarding transactions based on their personal knowledge.

The Eleventh Circuit's conclusion in *Hill* that the district court did not abuse its discretion, standing alone, lends some support for the view that the district court did not err here, where the lay witnesses answering the hypothetical questions possessed personal knowledge of their respective lenders' policies and procedures and knowledge of the loan files at issue. However, without elaboration, the *Hill* court also observed that, "[a]s for the witnesses who were

not personally involved with the transactions at issue, any error in admitting their testimony was harmless." *Id.* This language seemingly points in the opposite direction on the question of whether the district court erred here, suggesting that the Eleventh Circuit believed it would be error to allow lay witnesses to answer hypothetical questions about transactions as to which they did not have personal involvement. But the court did not expressly render such a holding in *Hill* and it did not offer any reason for drawing the distinction it did between those witnesses who were personally involved in the transactions and those who were not.

The best that we can say about *Hill* is that it sends unclear signals on the propriety under Rule 701 of the challenged lay witness testimony in this case. And, even if *Hill* tilts toward a conclusion that the district court erred here, it is only one case, and Mr. Powers has not demonstrated that *Hill*'s interpretation of the personal-knowledge requirement is representative of the weight of authority among our sister circuits. Accordingly, *Hill* will not take Mr. Powers across the finish line on the second prong of the plain-error test.

Furthermore, Mr. Powers's argument is undermined by decisions in a number of other circuits explaining that lay witnesses may, consistent with Rule 701(a), testify broadly regarding an employer's practices, policies, and procedures, so long as their testimony is derived from personal knowledge and experience at the business. *See, e.g.*, *United States v. Valencia*, 600 F.3d 389, 416 (5th Cir. 2010) (ruling that a former risk officer's testimony "recreat[ing]

15

much of the analysis he regularly performed when evaluating risk tolerances" was "properly characterized as . . . lay opinion" testimony because his "knowledge and analysis were derived from duties he held at [the firm]"); *US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 690 (8th Cir. 2009) ("[P]erceptions based on industry experience[] [are] a sufficient foundation for lay opinion testimony." (first alteration in original) (quoting *Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1004–05 (8th Cir. 1986)) (internal quotation marks omitted)); *United States v. Munoz-Franco*, 487 F.3d 25, 36 (1st Cir. 2007) (holding that a former executive's testimony regarding what information company's board "should have" had in its decisionmaking process was lay opinion testimony because her position and regular attendance at board meetings gave her the requisite personal knowledge); *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1223 (11th Cir. 2003) (determining that district court did not abuse its discretion in permitting officers and employees to testify as lay witnesses, based on their "particularized knowledge garnered from years of experience within the field," about the reasonableness of their corporation's pricing in light of industry standards).

In the instant case, where the lender witnesses' testimony was based on their personal knowledge and experience with their respective firms' application-assessment policies and procedures, it requires no great stretch of the imagination to see how a court could conclude that this testimony was based on the witnesses'

16

"first-hand knowledge or observation" as required by Rule 701(a).  *See* Fed. R. Evid. 701 advisory committee's note.  In sum, where "we cannot say . . . that the district court was clearly wrong," *Ruiz-Gea*, 340 F.3d at 1188, any error committed by the district court here under Rule 701(a) was not plain.

**2**

We next consider Mr. Powers's arguments regarding Rule 701(b), which requires a witness's testimony to be helpful to the jury.  Mr. Powers argues that the challenged testimony was not helpful because it was based on "hypothetical facts" and on "documents not in evidence," i.e., the lending institutions' underwriting guidelines.  Aplt. Opening Br. at 31.

With respect to use of hypothetical facts, we note again that Mr. Powers has identified no case from this court or the Supreme Court that clearly prohibits lay witnesses from offering opinion testimony based on their personal experience in response to hypothetical questions.  Indeed, the only case Mr. Powers cites for this proposition is the Eleventh Circuit's decision in *United States v. Henderson*, 409 F.3d 1293 (11th Cir. 2005), which does recite, in dicta, the view that "the ability to answer hypothetical questions is '[t]he essential difference' between expert and lay witnesses."  *Id.* at 1300 (alteration in original) (quoting *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1202 n.16 (3d Cir. 1995)).  But *Henderson*'s dictum is belied by the Eleventh Circuit's own more recent decision in *Hill*, which—as noted above—did not consider it an abuse of discretion for the

17

district court to allow lay witnesses to "answer[] hypothetical questions . . . based . . . on their personal experiences as officers of financial institutions with knowledge of their companies' policies and of the specific transactions at issue." *Hill*, 643 F.3d at 842. Even the Eleventh Circuit, then, does not appear to *categorically* reject lay witness opinion testimony in response to hypothetical facts, but instead considers the propriety of such testimony by reference to the basis of personal knowledge of the witness.

Thus, Mr. Powers cannot establish by reference to the Eleventh Circuit or otherwise that it is well-settled law that the mere fact that lender witnesses offer opinion testimony in response to hypothetical facts renders their testimony *categorically* unhelpful to the jury. And, considering that the witnesses here testified largely based on their knowledge and experience, as already discussed, we conclude that it was not clear or obvious error for the district court to determine that this testimony *was* in fact helpful to the jury. Any error in admitting this testimony—based on hypothetical questions—thus was not plain.

Mr. Powers's second contention under Rule 701(b) is that the lender witnesses' testimony was not helpful because they testified on the basis of the lenders' underwriting guidelines, which Mr. Powers asserts were not in evidence. At the outset, we note that Mr. Powers proceeds from a false factual predicate. The underwriting guidelines for two of the four lenders—SunTrust and National City Mortgage—actually *were* in evidence. The jury therefore had the

18

opportunity to compare the witnesses' testimony with the actual guidelines with respect to the five loans (out of nine) underwritten by these two lenders, and Mr. Powers was, of course, free to argue to the jury that they should afford less weight to the testimony about the guidelines that were not in evidence. Considering these facts, and considering that Mr. Powers has not pointed us to *any* caselaw or other authority that would suggest that the district court's admission of the testimony of the lender witnesses was clearly or obviously wrong under Rule 701(b), we conclude that Mr. Powers has not carried his burden on the second prong of the plain-error test.

**3**

Finally, we turn to Mr. Powers's contentions regarding Rule 701(c), which disallows testimony based on "scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). Mr. Powers argues that the lender witnesses' testimony was based on specialized knowledge of underwriting practices in the mortgage industry and thus was not admissible under Rule 701. The government responds that the testimony was admissible lay testimony because it was based on the witnesses' personal familiarity with the specific underwriting processes and policies of their employers and had been acquired through their employment with the lenders.

Our decision in *James River Insurance Co. v. Rapid Funding, LLC*, 658 F.3d 1207 (10th Cir. 2011), offers a useful framework for analyzing Mr. Powers's

19

challenge.  The testimony at issue there consisted of a real estate investor's valuation of property owned by his company; we concluded that it constituted expert opinion testimony.  Specifically, starting from the general principle that "Rule 701 'does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness,'" *id.* at 1214 (quoting *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 846 (10th Cir. 1979)), we identified in *James River* four "reasons [to] support our conclusion that [the] testimony fell outside the category of lay opinion," *id.*  To be clear, while we seek guidance from *James River*, we remain cognizant of the fact that we did not declare there that these four reasons would necessarily be cogent or even relevant in every case, nor did we purport to establish an exhaustive four-factor test.

Regarding the first factor, in *James River*, we noted that the valuation testimony both required the exercise of technical judgment (in choosing among alternative methodologies for calculating depreciation, for example) and involved calculations that "require[d] more than applying basic mathematics."  *Id.*  Second, the witness's calculations in *James River* were "based in part on his professional experience," which the court also found suggested that the testimony was expert opinion because "[k]nowledge derived from previous professional experience falls squarely within the scope of Rule 702."  *Id.* at 1215 (alteration in original) (quoting *United States v. Smith*, 640 F.3d 358, 365 (D.C. Cir. 2011)) (internal

20

quotation marks omitted). Third, the witness "relied on a technical report by an outside expert" that ran over fifteen hundred pages and used "specialized accounting calculations." *Id.* Fourth, and finally, *James River* involved "landowner testimony about land value," and the court observed that "the Federal Rules of Evidence generally consider [such testimony] to be expert opinion." *Id.*

Using *James River*'s four factors as a framework for our analysis—insofar as these facts are relevant on this record—we conclude that the district court did not commit clear or obvious error in concluding that the lender witnesses' testimony complied with Rule 701(c)'s requirements. With respect to the first factor, Mr. Powers argues that "[t]he lender representatives in this case were asked to perform debt-to-income ratio calculations . . . requiring them to apply specialized knowledge and prior experience in the mortgage industry well beyond that of the average lay person." Aplt. Opening Br. at 33. We disagree.

The calculation of debt-to-income ratios is the kind of basic math that we have permitted lay witnesses to include in their testimony. *Compare Ryan Dev. Co. v. Ind. Lumbermens Mut. Ins. Co.*, 711 F.3d 1165, 1170–71 (10th Cir. 2013) (ruling that an accountant's calculation of lost income and other claims using only "basic arithmetic, personal experience, and no outside expert reports" fell "under Rule 701 as lay testimony"), *and Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005) (holding that the calculation of the arithmetical mean of 103 numbers was "well within the ability of anyone with a grade-school

21

education" and "aptly characterized as a lay opinion"), *with LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004) (concluding that a calculation of lost profits that involved sophisticated economic models including "moving averages, compounded growth rates, and S-curves" was "technical" and "specialized" and could not be offered as lay opinion testimony).  Calculating such debt-to-income ratios simply involves dividing the loan applicant's monthly debts by her monthly income—a calculation, on the one hand, certainly no more complicated than finding the arithmetical mean of a large group of numbers, *see Bryant*, 432 F.3d at 1124, and hardly comparable, on the other hand, to the kind of complex computations described in either *James River* or *Lifewise*.

Regarding the second *James River* factor, we used somewhat categorical language in articulating it—*viz.*, "[k]nowledge derived from previous professional experience falls squarely within the scope of Rule 702," 658 F.3d at 1215—that could conceivably be read as placing under Rule 702 *all* witness testimony that stems to *any* degree from knowledge acquired through professional experience. But we believe that such an expansive reading of this language would be mistaken.  Indeed, in *James River*, we noted that lay witnesses could properly offer testimony that involved "a limited amount of expertise." *Id.* at 1214.  And such expertise surely could be (and often will be) the product of prior professional experience.  *Cf.* Fed. R. Evid. 701 advisory committee's note ("[M]ost courts have permitted the owner or officer of a business to testify to the

22

value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business." (citation omitted)); *James River*, 658 F.3d at 1216 (recognizing that we have previously "allowed business owners to testify [under Rule 701] about business (as opposed to property) value" where that testimony was based on "sufficient personal knowledge of their respective businesses and of the factors on which they relied to estimate lost profits" and where "the owners offered valuations based on straightforward, common sense calculations" (quoting *LifeWise*, 374 F.3d at 929–30) (internal quotation marks omitted)).

Furthermore, such a broad reading of this second-factor language of *James River* would be inconsistent with our recognition in *Ryan Development* that witnesses with arguably pertinent professional experience could nevertheless offer Rule 701 lay testimony under certain circumstances, including where they possess personal familiarity with documentary evidence at issue. *See Ryan Dev.*, 711 F.3d at 1170 (allowing accountants to testify as lay witnesses regarding lost income where their testimony was based on "personal experience" analyzing the documentary evidence at issue and involved only basic calculations, even "[t]hough accountants often testify as expert witnesses" ); *cf. Peshlakai v. Ruiz*,

23

No. CIV 13-0752 JB/ACT, 2013 WL 6503629, at *18 n.8 (D.N.M. Dec. 7, 2013) ("[A]lthough there is logic in the assumption that almost all of a physician's treatment of her patients relies on scientific technical, or other specialized knowledge, requiring it to be admitted under rule 702, the Tenth Circuit does not seem to draw such a bright line. Although the Tenth Circuit has not defined the bounds of permissible testimony for a treating physician as a lay witness, it seems that it is permissible for a treating physician to provide testimony about the treatment of the physician's patients.").

Like the accountants who were allowed to testify as lay witnesses in *Ryan Development*, the lender witnesses in this case testified based on their personal experience, employed only basic calculations, and did not rely on outside expert reports. Indeed, their testimony was—like the testimony of the business owner or officer discussed in the advisory committee's note to Rule 701—based on "particularized knowledge" that they possessed "by virtue of [their] position[s]" at their respective employers. Fed. R. Evid. 701 advisory committee's note. Thus, we are convinced that the district court would not—at the very least—have clearly or obviously strayed from the teaching of this second *James River* factor in concluding that the lender witnesses' testimony did not qualify as expert testimony, even though it was based in part on knowledge derived from their relevant professional experience. As for the third and fourth *James River* factors, they are not relevant here: there were no outside expert reports for the lay

24

witnesses to rely on, and the testimony was not related to land valuation. Therefore, we go no further than the first two factors. Based upon the foregoing analysis, we cannot say that the district court in this case committed a clear or obvious error under Rule 701(c).

In sum, we conclude that Mr. Powers's arguments relating to the admission of the lender witnesses' testimony as lay testimony under Rule 701 fail under plain-error review. Consequently, we do not disturb the district court's decision to admit this testimony.

## III

We turn now to Mr. Powers's second challenge on appeal. He argues that the district court erred in allowing the admission of loan records related to loans issued by RFC Cameron Financial Group, Inc. ("Cameron"). Four of the seventeen counts on which Mr. Powers was found guilty relate to loan transactions involving Cameron. At trial, the government did not seek to admit into evidence loan records that were obtained directly from Cameron. Instead, the government successfully entered into evidence Cameron loan documents that were in the files of companies that serviced Cameron loans. The original Cameron loan documents were apparently unavailable, having been destroyed some time prior to the government's attempt to obtain them (which itself occurred some time after Cameron declared bankruptcy and went out of business).

Mr. Powers argues that Cameron's loan applications and other relevant loan

25

documents were admitted erroneously under the business-records exception to the hearsay rule found in Federal Rule of Evidence 803(6), "which provides that certain records of regularly conducted business activity are admissible for their truth even though they contain hearsay." *United States v. Blechman*, 657 F.3d 1052, 1065 (10th Cir. 2011). At the outset, the government contends that Mr. Powers failed to properly preserve an objection to the admission of these records under Rule 803(6), and that, accordingly, we should review Mr. Powers's claim on appeal under the plain-error standard instead of for an abuse of discretion.

Thus, as with Mr. Powers's Rule 701 claims, we begin by inquiring whether Mr. Powers properly preserved his objections. Concluding that he did not, we proceed with our analysis under the demanding plain-error standard. We determine that, even assuming *arguendo* that the district court erred in admitting the Cameron documents, it did not clearly or obviously do so. Thus, Mr. Powers cannot prevail on this ground under the rigorous plain-error standard.

**A**

Mr. Powers does not claim to have objected during the trial to the introduction of the Cameron documents. But, in Mr. Powers's view, he did not need to because he had properly preserved this claim by objecting to the documents in a motion in limine. "A pretrial motion in limine to exclude evidence will not always preserve an objection for appellate review," but we have held that it "may . . . when the issue (1) is fairly presented to the district court,

26

(2) is the type of issue that can be finally decided in a pretrial hearing, and (3) is ruled upon without equivocation by the trial judge." *United States v. Mejia-Alarcon*, 995 F.2d 982, 986 (10th Cir. 1993); *see also* Fed. R. Evid. 103(b) ("Once the court rules definitively on the record—either before or at trial—a party need not renew an objection . . . to preserve a claim of error for appeal."). Under these standards, we conclude that Mr. Powers did not preserve his business-records claim because the district court did not rule definitively or unequivocally on Mr. Powers's objection on this ground.

Prior to trial, Mr. Powers filed a motion in limine objecting to the introduction of the Cameron records as business records of the loan servicers. He argued, *inter alia*, that:

> It is not sufficient that the United States present testimony from the loan servicers to the effect that their records contain documents from Cameron's loan file; what is important is that the custodian of records of a loan servicing company cannot authenticate the . . . entire contents of the records of the separate business which created them [i.e., Cameron].

R., Vol. I, at 589 (Mot. in Limine & Reply, filed Jan. 26, 2011).

The district court ruled on the motion orally at a hearing, and during a brief exchange there, Mr. Powers explained that his objection was directed at the adequacy of the foundation for the records. After the government responded that it would be able to lay appropriate foundations at trial for these records through witnesses from the loan servicing companies, the district court overruled Mr.

27

Powers's objections, "*[s]ubject to foundation being laid.*" *Id.*, Vol. III, at 204 (Hr'g Tr., dated Feb. 9, 2011) (emphasis added). In other words, the district court's ruling in favor of the admissibility of the documents was expressly contingent on the government laying a proper foundation for the documents.

The court's explicit statements therefore seemingly belie any suggestion that it ruled "definitively" or "without equivocation" on Mr. Powers's objection, *see* Fed. R. Evid. 103(b); *Mejia-Alarcon*, 995 F.2d at 986, and Mr. Powers points to no authority that would lead us to a contrary conclusion. Consequently, Mr. Powers was obliged to renew his foundation objections at trial; this he failed to do. Therefore, he has not preserved them for appeal, and our review is only for plain error.

**B**

Even if we assume *arguendo* that the district court erred by allowing the government to admit the Cameron loan documents as business records of the various companies that serviced the loans, we conclude that Mr. Powers cannot satisfy the second prong of the plain-error test because any such error was not clear or obvious. Our analysis of Mr. Powers's argument under Rule 803(6) requires some discussion of the alleged errors, even though we need not and do not decide whether there was actually any error in this case.

Mr. Powers claims that the district court erred by failing to properly heed the requirements set forth in Rule 803(6), which articulates an exception from the

28

hearsay doctrine for

> [a] record of an act, event, condition, opinion, or diagnosis if:
> (A) the record was made at or near the time by—or from
> information transmitted by—someone with knowledge; (B) the
> record was kept in the course of a regularly conducted activity of
> a business, organization, occupation, or calling, whether or not
> for profit; (C) making the record was a regular practice of that
> activity; (D) all these conditions are shown by the testimony of
> the custodian or another qualified witness . . . ; and (E) neither
> the source of information nor the method or circumstances of
> preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). In essence, Mr. Powers argues that it was error for the

district court to admit the Cameron files as the business records of the loan

servicing companies, because the records custodians of those companies were not

in a position to establish the required foundation under the Rule.[8] In particular,

---

[8] We have interpreted Rule 803(6) to require the records custodian or
another qualified witness to lay foundation testimony establishing that

> the records (1) were prepared in the normal course of business;
> (2) were made at or near the time of the events recorded; (3)
> were based on the personal knowledge of the entrant or of a
> person who had a business duty to transmit the information to the
> entrant; and (4) are not otherwise untrustworthy.

*United States v. Irvin*, 682 F.3d 1254, 1261 (10th Cir. 2012). Here, the
government put on three witnesses to lay the foundation for the Cameron
documents. The first witness, the records custodian for Specialized Loan
Services, testified that the documents were "records of acts and events made at or
near the time, by or from information transmitted by a person with knowledge of
the events recorded in th[e] documents"; "kept in the course of Specialized Loan
Services' regularly conducted business activity"; that it was "the regular practice
of Specialized Loan Services' business activity to make those records"; the
records were "true and accurate copies of th[e] originals"; and they were "records
collected or generated by Specialized Loan Services in connection with loans

(continued...)

29

according to Mr. Powers, because Cameron created the documents, witnesses from the loan servicing companies could not offer the required proof that the documents were prepared in the normal course of business or that they were prepared at or near the times of the transactions. Nor, reasons Mr. Powers, could they speak to whether the documents were complete or accurate.

Mr. Powers's arguments boil down to an assertion that the district court erroneously applied the so-called "adoptive business records" doctrine, under which "a record created by a third party and integrated into another entity's records" can be "admissible as the record of the custodian entity," so long as certain other requirements are met that fully satisfy the strictures of Rule 803(6). *Brawner v. Allstate Indem. Co.*, 591 F.3d 984, 987 (8th Cir. 2010). He argues that we should either reject this doctrine outright—and, therefore, presumably conclude that the district court erred in resorting to it—or, alternatively, embrace the doctrine but hold that, in order for witnesses to satisfy its requirements, they must provide substantial foundational testimony relating to matters such as the record-keeping system of the business that prepared the records. If we elect to adopt the latter approach, Mr. Powers urges us to conclude that the district court

---

[8](...continued)
applied for in connection with the purchase of [the property at issue]." R., Vol. III, at 665–66. The other two witnesses testified similarly for their respective companies. In short, all three records custodians offered testimony that was purportedly designed to satisfy the foundational requirements set out in Rule 803(6).

erred in admitting the challenged loan documents because "[t]he custodians here could only confirm that the loan servicers collected Cameron's documents but had no knowledge as to how Cameron's records were produced" or whether the documents "were complete or accurate." Aplt. Opening Br. at 48–49.

Because we are reviewing Mr. Powers's challenge only for plain error, however, we have no need to comprehensively engage in an analysis of the substance of Mr. Powers's arguments, and we decline to do so. Notably, we need not definitively opine on whether the district court erred (as a categorical matter) in recognizing the adoptive business records doctrine, or erred in applying the doctrine on the facts of this case. In other words, we need not address the first prong of the plain-error test. Instead, we elect to restrict our analysis to the second prong, that is, whether the district court committed clear or obvious error. With respect to that prong, we conclude that there is no controlling precedent—from our court or the Supreme Court—that definitively speaks to the vitality of the adoptive business records doctrine, much less precedent that explicitly prohibits the district court from recognizing that doctrine, or that mandates that the district court apply the doctrine in any particular way. Furthermore, we have no reason to believe that the court's tacit interpretation of Rule 803(6) as embodying such a doctrine is otherwise clearly erroneous. Accordingly, for these reasons, we determine that Mr. Powers cannot satisfy the second prong of the plain-error test.

31

As previously noted, our analysis on this prong generally turns on whether "either the Supreme Court or this court . . . have addressed the issue." *Ruiz-Gea*, 340 F.3d at 1187.  However, in the absence of such precedent, we may find this prong satisfied where the district court's interpretation of the statutory or regulatory provision at issue is "clearly erroneous," *United States v. Story*, 635 F.3d 1241, 1248 (10th Cir. 2011) (internal quotation marks omitted); *accord United States v. Poe*, 556 F.3d 1113, 1129 (10th Cir. 2009).  Mr. Powers recognizes that our circuit has not previously opined in a controlling decision on the vitality or propriety of the adoptive business records doctrine.  *See Irvin*, 682 F.3d at 1265 ("This court has . . . never decided whether 'adoptive business records' are admissible under Rule 803(6).").[9]  Nor has the Supreme Court opined on the subject.  Thus, if Mr. Powers hopes to keep the door open on his claim that the district court clearly or obviously erred in recognizing and applying the doctrine, *cf. Schneider*, 704 F.3d at 1304 (Holmes, J., concurring, joined by Martinez, J.) (noting that, "[g]enerally, such a circumstance [i.e., the absence of controlling Tenth Circuit or Supreme Court precedent] will close the door on a

---

[9]     *Irvin* clarified any ambiguity over whether we had previously recognized the doctrine in *United States v. Carranco*, 551 F.2d 1197 (10th Cir. 1977).  *Irvin* made clear that *Carranco* merely "recognized [that] such an argument could have been made on the facts of that case, but declined to separately consider it because the necessary objections had not been made before the trial court."  *Irvin*, 682 F.3d at 1265.  "At best," we wrote, "*Carranco* can be read as assuming, without deciding, that one company can 'adopt' the business records of another company for purposes of Rule 803(6)."  *Id.*

claim that the error . . . is clear or obvious"), he must demonstrate that the district court's tacit interpretation of Rule 803(6) as embodying such a doctrine is clearly erroneous.  This he cannot do.

In this regard, our survey of the landscape of our sister circuits' decisions indicates that—far from acting in a clearly erroneous fashion—the district court's tacit reading of the scope of Rule 803(6) to include the adoptive business records doctrine was quite reasonable (if not mandatory).  Specifically, the courts of appeals have overwhelmingly chosen to recognize—either explicitly or implicitly—an adoptive business records doctrine.  *See, e.g.*, *Brawner*, 591 F.3d at 987 (collecting cases and agreeing with the "[s]everal other courts [that] have held that a record created by a third party and integrated into another entity's records is admissible as the record of the custodian entity, so long as the custodian entity relied upon the accuracy of the record and the other requirements of Rule 803(6) are satisfied"); *United States v. Adefehinti*, 510 F.3d 319, 326 (D.C. Cir. 2007) (collecting cases and joining the "several courts [that] have found that a record of which a firm takes custody is thereby 'made' by the firm within the meaning of the rule (and thus is admissible if all the other requirements are satisfied)"); *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1342–44 (Fed. Cir. 1999) (reviewing cases and holding that testimony regarding "first-hand knowledge as to the procedures used in the original preparation of each of the [documents at issue] . . . is not necessary where an organization

33

incorporated the records of another entity into its own, relied upon those records in its day-to-day operations, and where there are other strong indicia of reliability").

In the face of this widespread acceptance of the adoptive business records doctrine among our sister circuits, Mr. Powers fails to direct us to any court that has specifically rejected the doctrine. Indeed, the only legal authority Mr. Powers cites in opposition to the doctrine's applicability is the *dissenting* opinion in *Air Land Forwarders*. This lopsided support for the doctrine indicates that Mr. Powers cannot possibly demonstrate here that the district court's reading of Rule 803(6) to encompass the doctrine is clearly erroneous. *Cf. Story*, 635 F.3d at 1248 ("Our circuit precedent has repeatedly noted that a circuit split is strong evidence that an error is not plain."). Thus, in this case, the absence of controlling authority from our court or the Supreme Court regarding the adoptive business records doctrine does "close the door," *Schneider*, 704 F.3d at 1304 (Holmes, J., concurring, joined by Martinez, J.), on Mr. Powers's claim that the district court clearly or obviously erred in admitting the Cameron records based on the testimony of the loan-servicing-company records custodian witnesses. Thus, Mr. Powers cannot satisfy the second prong of the plain-error test on this ground.

**IV**

Lastly, we address Mr. Powers's argument that the district court incorrectly

34

applied the gross-receipts enhancement of the Guidelines in calculating his sentence. This enhancement provides that if a "defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense," he is subject to a two-level increase to his base offense level. U.S.S.G. § 2B1.1(b)(14)(A). The commentary to this section explains that "the defendant shall be considered to have derived more than $1,000,000 in gross receipts if the gross receipts to the defendant individually, *rather than to all participants*, exceeded $1,000,000." U.S.S.G. § 2B1.1 cmt. n.11(A) (emphasis added). Mr. Powers's appeal focuses on the district court's interpretation of the term "participants"—specifically, he argues that the district court erroneously failed to treat the buyers for whom Mr. Powers prepared falsified loan applications as "participants" within the meaning of the application note, and thus erred by attributing to Mr. Powers money that was ultimately transferred to the buyers.

The meaning of "participants" in this context is an issue of first impression in this court. Addressing it here, we clarify that district courts identifying "participants" in a fraud for purposes of U.S.S.G. § 2B1.1(b)(14)(A) should employ the definition of "participant" set forth in U.S.S.G. § 3B1.1 cmt. n.1 and ask whether an individual was a "participant" in the "relevant conduct" as defined

in U.S.S.G. § 1B1.3(a)(1)(B).[10]  Recognizing that the record here does not permit us to apply this standard without engaging in fact-finding—which the courts of appeals eschew—we remand to the district court with instructions to vacate Mr. Powers's sentence; to determine, consistent with this order and judgment, which of the buyers were "participants" in Mr. Powers's charged scheme and its relevant conduct; and to re-sentence Mr. Powers accordingly.

We review the district court's legal interpretation of the Guidelines de novo, *see United States v. Hamilton*, 587 F.3d 1199, 1222 (10th Cir. 2009), and "interpret the Sentencing Guidelines according to the accepted rules of statutory construction," *United States v. Nacchio*, 573 F.3d 1062, 1066 (10th Cir. 2009).

---

[10]　In pertinent part, U.S.S.G. § 1B1.3 explains that offense characteristics under chapter two of the Guidelines and adjustments under chapter three "shall be determined on the basis of":

> (1)　(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

U.S.S.G. § 1B1.3(a)(1)(A)–(B).

When we interpret a guideline, we look first to the language of the guideline itself, and then to the guideline's interpretive and explanatory commentary, which "is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Nacchio*, 573 F.3d at 1066–67.

In this case, neither the text of U.S.S.G. § 2B1.1(b)(14)(A) nor the commentary to this section offers a definition of "participants," though we consider it relevant that this word is employed, rather than a more specific term such as "codefendants." We have not previously defined the scope of the word "participants" for purposes of the gross-receipts enhancement, and the Supreme Court also has been silent on the subject. This is not to say that we have not previously interpreted the terms of the enhancement. In particular, in *United States v. Weidner*, 437 F.3d 1023 (10th Cir. 2006), we clarified that the enhancement precludes attribution of the same money to multiple codefendants. *Id.* at 1046. *Weidner* also contains language that suggests that the term "participants" is not synonymous with the term "codefendants."[11] *See id.* (distinguishing a Third Circuit opinion by noting that there was no indication in that case "that the individuals to whom the defendant transferred the receipts were

---

[11] Although *Weidner* does contain language that suggests a broader reading of the term "participants" than "codefendants," we recognize that this language is arguably dictum on the facts of *Weidner* because there the gross-receipts enhancement was applied based on the conduct of codefendants.

codefendants or *otherwise participated* in the criminal scheme" (emphasis added)).

Because the text and commentary of U.S.S.G. § 2B1.1(b)(14)(A) are both silent concerning the definition of its term "participants" and because controlling caselaw is as well, we turn to the traditional tools of statutory construction. *See United States v. Marrufo*, 661 F.3d 1204, 1207 (10th Cir. 2011) ("We interpret the Sentencing Guidelines according to accepted rules of statutory construction." (quoting *Nacchio*, 573 F.3d at 1066) (internal quotation marks omitted)). As particularly relevant here, it is well-settled that "[t]he normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning." *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) (internal quotation marks omitted); *accord First Nat'l Bank of Durango v. Woods (In re Woods)*, 743 F.3d 689, 697 (10th Cir. 2014); *see Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("[T]here is a presumption that a given term is used to mean the same thing throughout a statute . . . ."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170–73 (2012) (discussing the "presumption of consistent usage").

In light of this canon of construction, we find it particularly worthy of attention that another provision of the Guidelines expressly defines the term "participant." *Cf. Nacchio*, 573 F.3d at 1073 & n.11 (noting that our interpretation of "gain" in one section of the Guidelines "comports with another

38

reference to 'gain' in the Guidelines").  U.S.S.G. § 3B1.1 provides adjustments to a defendant's offense level based on his or her role in the offense, measured by key factors such as the number of "participants" involved in the offense.  For example, the guideline provides for a four-level increase where a defendant "was an organizer or leader of a criminal activity that involved five or more participants."  U.S.S.G. § 3B1.1(a).

In the application notes to § 3B1.1, the advisory committee defined "participant": "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted.  A person who is not criminally responsible for the commission of the offense (*e.g.*, an undercover law enforcement officer) is not a participant."  U.S.S.G. § 3B1.1 cmt. n.1.  In light of the well-established presumption of consistent usage, and in the absence of any contrary authority, we conclude that the word "participants" for purposes of the gross-receipts enhancement of U.S.S.G. § 2B1.1 should be read consistently with the role-in-the-offense definition of the essentially identical term in the commentary to U.S.S.G. § 3B1.1.  And, under that definition, a "participant" need not have committed the same criminal offense as the defendant; it is enough that the "participant" was criminally involved in—and, therefore, culpable for—the same relevant conduct, as that concept is explicated in U.S.S.G. § 1B1.3.  *See, e.g.*, *United States v. VanMeter*, 278 F.3d 1156, 1166 (10th Cir. 2002).

39

In *VanMeter*, we explained that courts must "consider all relevant conduct under U.S.S.G. § 1B1.3 in determining the application of a U.S.S.G. § 3B1.1 aggravating role adjustment." *Id.* And we specifically held that it made "no difference" that the alleged participant "may not have been responsible for violating [the statute under which the defendant was convicted]," because the defendant had "supervis[ed]" the alleged participant's criminally culpable acts that were a part of the "relevant conduct" for the defendant's offense of conviction. *See id.*

Thus, applying U.S.S.G. § 3B1.1's definition of "participant" in the context of the gross-receipts enhancement, the material inquiry is not whether the home borrowers recruited by Mr. Powers were charged or convicted of the same crimes but, rather, whether they were involved in the same relevant conduct as Mr. Powers—that is, whether they should be considered criminally culpable actors in the same relevant conduct. Put another way, in seeking under U.S.S.G. § 2B1.1(b)(14)(A) to identify participants—that is, those individuals whose obtaining of monetary receipts affects the application of the gross-receipts enhancement—courts should focus on the putative participants' criminal culpability for the same relevant conduct attributed to the defendant; participants can include individuals who have been neither charged nor indicted, and

40

participants need not be culpable for the same offense as the defendant.[12]

In this case, the standard we have articulated means that if the buyers were criminally culpable for acts that are part and parcel of the relevant conduct of Mr. Powers's mortgage fraud scheme, the cash back that they received would not qualify as "gross receipts to the defendant [i.e., Mr. Powers] individually, rather than to all participants," and thus could not be factored into the determination of whether Mr. Powers received the requisite amount, in excess of $1,000,000, which would trigger the enhancement under U.S.S.G. § 2B1.1. The district court did not make factual findings regarding the criminal culpability of the buyers in Mr. Powers's relevant conduct. Accordingly we are not in a position to determine whether any or all of the buyers ought to have been considered participants for purposes of the gross-receipts enhancement under U.S.S.G. § 2B1.1. For this reason, we remand the case to the district court with instructions to vacate the portion of its judgment related to Mr. Powers's sentence; to determine, consistent with this order and judgment, which of the buyers were "participants" in Mr. Powers's scheme; and to re-sentence Mr. Powers accordingly.

**V**

---

[12] Mr. Powers has consistently expressed his approval of a similar view, arguing that the buyers in this case should have been counted as participants for purposes of the gross-receipts enhancement simply because they "were involved in the fraud scheme." Aplt. Opening Br. at 64; *see also id.* (arguing that "participants" should not be limited to codefendants or distinguish between indicted and unindicted individuals).

41

For the foregoing reasons, we **AFFIRM** Mr. Powers's conviction but **REMAND** the case to the district court with directions to **VACATE** Mr. Powers's sentence and re-sentence Mr. Powers consistent with this order and judgment and, in particular, with our analysis of the term "participants" in the gross-receipts enhancement of U.S.S.G. § 2B1.1.[13]

                                        Entered for the Court


                                        JEROME A. HOLMES
                                        Circuit Judge

---

[13] The government filed a motion to supplement the record, which Mr. Powers did not oppose. We **GRANT** that motion.